## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HYBRID ATHLETICS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HYLETE LLC,<br>HYLETE, INC.,<br>RONALD L. WILSON, II, and<br>MATTHEW PAULSON,<br><br>Defendants. | Civil Action No. 3:17-CV-1767-VAB<br><br>JURY TRIAL DEMANDED<br><br>COMPLAINT FOR FEDERAL TRADEMARK INFRINGEMENT; FALSE DESIGNATIONS OF ORIGINS AND UNFAIR COMPETITION; UNFAIR COMPETITION UNDER CT UNFAIR TRADE PRACTICES ACT; COMMON LAW TRADEMARK INFRINGEMENT; and UNJUST ENRICHMENT. |

## FIRST AMENDED COMPLAINT

Plaintiff Hybrid Athletics, LLC ("Hybrid" or "Plaintiff") for its Complaint against

Defendants Hylete LLC, Hylete, Incorporated (Hylete LLC and Hylete, Incorporated are

collectively referred to as "Hylete"), Ronald L. Wilson, II ("Mr. Wilson"), and Matthew Paulson

("Mr. Paulson") (Hylete, Mr. Wilson, and Mr. Paulson are collectively referred to as,

"Defendants"), alleges as follows:

### Introduction

1.      This is an action for federal trademark infringement, unfair competition, and false

designation of origin in violation of the Federal Lanham Act, 15 U.S.C. § 1051 *et seq*.; common

law trademark infringement; and state unfair competition in violation of the Connecticut Unfair

Trade Practices Act against Defendants for their improper commercial use and exploitation of

1

trademarks that are confusingly similar to Hybrid's trademarks on or in connection with the offer and provision of goods and/or services.

2.      Hybrid brings this action to protect its reputation for selling products and services of the highest quality, prevent deception of the consuming public by Defendants, retain control over the substantial goodwill associated with Hybrid's business and trademarks, and to avoid irretrievably lost sales.

3.      Hybrid hereby seeks (1) injunctive relief against Defendants' continued unauthorized, improper, and willful commercial use and exploitation of any trademark confusingly similar to any of Hybrid's trademarks; and (2) all damages arising from Defendants' past and present infringement, including all statutory damages and Hybrid's attorneys' fees and costs for having to bring this suit to enforce its trademark rights.

## Parties

4.      Hybrid is a Limited Liability Company having its principal place of business at 76 Progress Drive, Stamford, CT 06902.

5.      Upon information and belief, Hylete LLC is a Limited Liability Company organized under the laws of California with an address at 135 S. Sierra Ave., Unit 20, Solana Beach, California 92075, United States.

6.      Upon information and belief, Hylete, Incorporated is a corporation organized under the laws of California with an address at 564 Stevens Avenue, Solana Beach, CA 92075.

7.      Upon information and belief, Hylete LLC was converted to Hylete, Incorporated effective January 2015.

8.      Upon information and belief, Mr. Wilson resides at 930 Via Mil Cumbres, Unit 139, Solana Beach CA 92075.

9.     Upon information and belief, Mr. Wilson owns and operates Hylete.

10.     Upon information and belief, Mr. Wilson exercises control over Hylete and is a moving conscious, dominant, and active force behind Hylete's unlawful conduct complained of herein, which unlawful conduct Mr. Wilson has engaged in for the benefit of Hylete and for his own individual gain and benefit.

11.     Upon information and belief, Mr. Paulson resides at 95 South 280, East Orem, Utah, 84058.

12.     Upon information and belief, Mr. Paulson owns and operates Hylete.

13.     Upon information and belief, Mr. Paulson exercises control over Hylete and is a moving conscious, dominant, and active force behind Hylete's unlawful conduct complained of herein, which unlawful conduct Mr. Paulson has engaged in for the benefit of Hylete and for his own individual gain and benefit.

14.     Upon information and belief, Defendants are doing business through the website www.hylete.com.

## Jurisdiction and Venue

15.     This Court has jurisdiction pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, and 1338(a) over the federal trademark infringement, false designation of origin and unfair competition claims, which arise under the Federal Lanham Act, 15 U.S.C. § 1051 *et seq*.; and has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1338(a)-(b) and 1367 over the state and common law claims.  This Court also has diversity jurisdiction under 18 U.S.C. § 1332 because Hybrid and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs

16.     Upon information and belief, this Court has jurisdiction over Defendants by virtue

of their systematic and continuous contacts with Connecticut, or because Defendants have (1) transacted and done business in Connecticut, (2) solicited consumers in this District, (3) offered to sell or sold goods in this District, (4) committed a tortious act within the state, (5) committed a tortious act outside the state causing injury within the state and (a) regularly do business or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered, in the state, or (b) expect or reasonably should expect their tortious acts to have consequences in the state and derive substantial revenue from interstate or international commerce, (6) have websites and social media accounts that are accessible in this District; (7) direct sales of infringing goods into this state. Defendants' acts form a substantial part of the events or omissions giving rise to Hybrid's claims. For example, Defendants offer to sell and/or sell infringing products to consumers or retailers in this District.

17.     Upon information and belief, Defendants sell goods to consumers in Connecticut through an interactive website, www.hylete.com, on which the infringing goods are marketed, offered for sale, and sold, and through which consumers can contact Defendants to purchase Hylete's goods, among other things.

18.     Defendants have committed acts of intellectual property infringement in Connecticut, including this judicial district, and have delivered infringing goods into the stream of commerce with the expectation that they will be used and/or purchased by consumers in the State of Connecticut, including this judicial district.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the wrongful events giving rise to this action took place in this District and Hybrid has suffered harm in this District.

<u>**Facts Common To All Claims For Relief**</u>

**A.      Hybrid Athletics, LLC's Well-Known Trademarks**

a.   <u>The Hybrid Athletic Trademarks</u>

20.      Hybrid is a company and well-known fitness brand that offers and conducts various fitness and health services such as personal training and fitness classes. It also sells fitness apparel and fitness training equipment.

21.      Hybrid chose the name HYBRID ATHLETICS because its founder, Robert Orlando, called himself a "hybrid athlete" as he trained and was a trainer in multiple methods of fitness.

22.      Hybrid extensively uses its HYBRID ATHLETICS and  mark in connection with the goods and services it offers and sells.

23.      Hybrid is owned and operated by Mr. Orlando.  Mr. Orlando is responsible for all aspects of the business, including advertising, sales, and finances.

24.      Hybrid is the owner of the following U.S. federally registered trademarks:

| Mark | Reg. No. | Reg. Date | Date of First Use | Goods |
|---|---|---|---|---|
|  | 4480850 | 2/11/2014 | 8/1/2008 | Conducting fitness classes; Health club services, namely, providing instruction and equipment in the field of physical exercise; Personal fitness training services and consultancy; Physical fitness instruction. |
|  | 4609469 | 9/23/2014 | 12/31/2008 | Bottoms; headwear; tops |
| **HYBRID ATHLETICS** | 4722185 | 4/21/2015 | 8/1/2008 | Conducting fitness classes; Health club services, namely, providing instruction and equipment in the field of physical exercise; Personal fitness training services |

| | | | | and consultancy; Physical fitness instruction. |
|---|---|---|---|---|

(collectively the "Hybrid Federal Marks").  These registrations are valid and subsisting.  True and correct copies of the Hybrid Federal Marks' trademark registrations are attached as **Exhibit A** and are incorporated herein by reference.

25.     Hybrid, and its predecessor in interest, Mr. Orlando, have used the Hybrid Federal Marks beyond the goods and services listed in the registrations. Hybrid has and continues to use the HYBRID ATHLETICS mark on clothing, accessories, and gym equipment and the  design on gym equipment long before Hylete was created (collectively the "Hybrid Common Law Marks") (the Hybrid Federal Marks and the Hybrid Common Law Marks are collectively the "Hybrid Marks").

b.    Background of Mr. Orlando's Career in Fitness and His Fame

26.     From approximately 2005-2010, Mr. Orlando was competing as a Strongman athlete in various events every three to four months. In his last Strongman event, Viking Fest in 2010, Mr. Orlando took first place.

27.     In 2006, Mr. Orlando was introduced to CrossFit and between 2009 and 2011, Mr. Orlando was a competitive CrossFit athlete.

28.     CrossFit is one of the fastest growing sports and exercise programs not only in the U.S., but worldwide with millions of followers, participants and teams across the globe.

29.     In 2009, 2010 and 2011, Mr. Orlando competed and placed in the CrossFit Games. He placed top three in the CrossFit Northeast Regional Qualifier in 2009, 2010 and 2011, including winning the Northeast Regional in 2010. More impressive, Mr. Orlando placed 22nd and 15th in the CrossFit Games in 2009 and 2010, in which thousands of athletes

participated.

30.     Between 2008 and 2012, Mr. Orlando promoted Hybrid Athletics and wore Hybrid Athletic clothing during his competitions, thereby exposing the brand to millions of consumers and athletes and in the 2010 and 2011 season alone, Hybrid Athletics sold approximately 7,000 t-shirts at the CrossFit competitions.

31.     Mr. Orlando swiftly became famous in CrossFit.  As such, CrossFit featured Mr. Orlando as a top ten athlete for which he was promoted in numerous videos posted online leading up the CrossFit Games (which included the Hybrid Marks). Mr. Orlando was also featured in a Hi-Temp Weight Equipment commercial that aired at the 2010 CrossFit Games, again featuring him in apparel bearing the Hybrid Marks.  These videos and commercials are still

32.     Mr. Orlando has also published numerous workout videos between 2008 and the present featuring the Hybrid Marks on his YouTube channel, workouts which have been viewed millions of times.

33.     Due to Mr. Orlando's huge popularity and success in CrossFit early in his career, his reputation allowed him from break into fields beyond that of CrossFit. For instance, Mr. Orlando was featured in Muscle & Fitness magazine,[1] in the July 2011, September 2011, and March 2012 issues (all featuring the Hybrid Marks).  Mr. Orlando then became a regular column writer for Muscle & Fitness (again featuring the Hybrid Marks) and still contributes articles.

34.     Throughout Mr. Orlando's career, he has not only trained athletes in his gyms, but he was for many years a CrossFit Subject Matter Expert and personally ran CrossFit's Strongman Trainer Courses.  He held these courses in the U.S. and all around the world (all

---

[1] Muscle & Fitness has been in publication for approximately 75 years and is the preeminent monthly fitness training magazine appealing to exercise enthusiasts and athletes of all ages. Upon information and belief, there are about 8 million unique viewers of the magazine per month.

while promoting and selling apparel featuring the Hybrid Marks). Between September 2011 and

January 2014, Mr. Orlando taught 72 seminars, with over 2,800 attendees, with 45 of the 72

seminars being taught throughout the U.S.

35.     Mr. Orlando continues to travel worldwide visiting gyms and conducting

demonstrations at on behalf of CrossFit.

36.     Due to Mr. Orlando's fame and constant efforts to promote Hybrid Athletics and

the Hybrid Marks, the Hybrid Athletics gyms has become destination spots to many CrossFitters

around the world, who visit and take a picture in front of the wall featuring the iconic Hybrid

Marks (as shown below in para. 27).

     c.   <u>Hybrid Athletics' Extensive and Continuous Use of the Hybrid Marks</u>

37.     In 2008, Hybrid opened its first fitness gym location in Stamford, Connecticut. In

2016, Hybrid opened its second fitness gym location in Bridgeport, Connecticut. Both of these

gyms are CrossFit associate gyms and both prominently display the HYBRID ATHLETICS and

  

trademarks throughout the venues.  Examples include:

38.     A wide variety of services are offered by Hybrid and Mr. Orlando in connection

to the Hybrid Marks, including CrossFit training, Strongman training, personal training, and

multiple fitness classes in the U.S. and worldwide.

39.     Hybrid, in association with its services, also sells a variety of apparel bearing the

Hybrid Marks, including shirts, hats, shorts and socks, in the U.S. and worldwide. Examples include:

 

40.     In addition to clothing and fitness services, Plaintiff also uses the Hybrid Marks on a variety of gym equipment, including but not limited to atlas stone molds, axles, farmer's handles, yokes, and logs which are sold in the U.S. and worldwide.  Examples include:

  

41.     Since as early as 2008, Hybrid has sold, promoted, and continues to sell and promote its apparel, fitness equipment, and physical fitness services bearing the HYBRID ATHLETICS and  trademarks through the Hybrid gyms, websites, hybridathletics.net and hybridatheticsapparel.com, social media, at CrossFit Strongman training courses, at CrossFit competitions, including the CrossFit Games, throughout the U.S., charity events, and/or through

9

other online vendors.

42.    Hybrid and its predecessor in interest, Mr. Orlando, has extensively and continuously used, in U.S. commerce, the Hybrid Marks since at least as early as August 2008 and December 2008 in connection to its fitness services and apparel. Due to such extensive and continuous use, Hybrid has developed tremendous consumer recognition of and goodwill in the Hybrid Marks.

43.    Hybrid uses the Hybrid Marks in a segmented and combined fashion.  For example, Hybrid uses the Hybrid Marks whereby only the  is shown. Hybrid uses the Hybrid Marks whereby only HYBRID ATHLETICS is shown.  Hybrid also uses the Hybrid Marks whereby the and HYBRID ATHLETICS are shown together.  An example of such use is displayed below:



44.    Hybrid is responsible for maintaining control over the quality of its goods and services, including the goods and services described in the Hybrid Marks' registrations and the goods and services described in the paragraphs above.

45.    Hybrid sells and markets its goods and services to individuals in the CrossFit community, as well as to individuals interested in fitness in general.

46.     Hybrid has developed a reputation for high quality goods and services in the U.S.

47.    Due to Hybrid's extensive and continuous use of the Hybrid Marks since 2008 in connection with its goods and services, the Hybrid Marks have become strong identifiers of

Hybrid's clothing, equipment, and fitness services.

48.     By virtue of Hybrid's long, continuous use of the Hybrid Marks, the high quality of Hybrid's goods and services used in connection therewith, and the substantial marketing and publicity of the Hybrid Marks, the Hybrid Marks are very well-known, if not famous in the fitness industry, and have been well-known since long before the unlawful activities of Defendants complained of herein.

**B.      Defendants' Infringing Activities.**

49.     Upon information and belief, Hylete is a manufacturer, distributor, and seller of athletic clothing apparel.

50.     Upon information and belief, Defendants market, distribute, and sell goods to the CrossFit community and to those interested in fitness in general. As such, Defendants target consumers that are the same as Hybrid's.

51.     Long after Hybrid's adoption and first use of the Hybrid Marks, Defendants started to use the Hybrid Marks, or marks substantially similar thereto, without authorization from Hybrid, in connection with athletic apparel, including but not limited to shorts, shirts, hats, and socks (the "Infringing Goods.").  An image of Defendants' use and adoption of the Hybrid Marks, or marks substantially similar and confusing thereto, is provided below:



(*See also* **Exhibit B**, sample screenshots from Hylete's website from 2012 through the present promoting and offering for sale the Infringing Goods, which is incorporated herein by reference.)

52.     Upon information and belief, Defendants market and sells the Infringing Goods

through its physical sales and its operation of an interactive website, available at

www.hylete.com. Hylete's website is publically accessible to consumers in Connecticut and

those throughout the U.S.

53.     The records of the United States Patent and Trademark Office indicate that Hylete

is the owner of the following U.S. trademark applications:

| Mark | Application Serial No. | Application Filing Date | Date of First Use | Goods |
|---|---|---|---|---|
|  | 85837045 | 1/30/2013 | 4/9/2012 | Athletic apparel, namely, shirts, pants, shorts, jackets, footwear, hats and caps |
|  | 87330360 | 2/9/2017 | Intent-to-use | Athletic apparel, namely, shorts, tees, thermals, henleys, polos, tanks, pants, jackets, hoodies, footwear, headwear, socks, undergarments, tights, crops, joggers, jeans, sports bras, compression, wristbands, and athletic uniforms |

54.     The records of the United States Patent and Trademark Office indicate that Hylete

is the owner of the following U.S. trademark registration:

| Mark | Reg. No. | Reg. Date | Date of First Use | Goods |
|---|---|---|---|---|
| **HYLETE** | 4318646 | 4/9/2013 | 4/9/2012 | Athletic apparel, namely, shirts, pants, shorts, jackets, footwear, hats and caps. |

(Hylete's  and "HYLETE" applications and registrations are collectively the "Hylete Marks").

True and correct copies of the Hylete Marks' applications and registration are attached as

**Exhibit C** and are incorporated herein by reference.

55.     The goods identified in the Hylete Marks are in International Class 25 and include

athletic apparel and other various clothing items, which are identical to goods sold by Hybrid.

56.     Hybrid's rights in the Hybrid Marks are prior in time to Hylete's dates of alleged

first use asserted for the Hylete Marks.

57.     As shown below, the Hylete Marks are visually and linguistically similar to the

Hybrid Marks:

| Hylete's Mark | Plaintiff's Mark |
|---|---|
|  |  |
| Hylete's Mark | Plaintiff's Mark |
| <br>**HYLETE** | <br>**HYBRID ATHLETICS** |

58.     "HYLETE" is a combination and/or contraction of the words "Hybrid" and "Athlete," which are the same words, or confusingly similar to, as those of Hybrid, i.e. "Hybrid" and "Athletics."

59.     Upon information and belief, Defendants use the Hylete Marks in a segmented and combined fashion.  For example, Defendants use the Hylete Marks whereby only the  logo is shown, whereby only HYLETE is shown, and whereby the  logo and HYLETE are both shown.

60.     Upon information and belief, Defendants extensively used and continue to use the  logo alone since at least April 2012.  True and correct printouts from Hylete's website displaying the use of the Hylete Marks are attached hereto in **Exhibit B.**

61.     Upon information and belief, Defendants extensively used and continue to use the combination of  and HYLETE, including without limitation use of the marks adjacent to each other, since at least April 2012. True and correct printouts from Hylete's website displaying the use of the Hylete Marks as one logo are attached hereto as **Exhibit B**.

62.     Upon information and belief, prior to selling substantial Infringing Goods bearing the Hylete Marks, Mr. Wilson personally flew to China to set up manufacturing arrangements for

Hylete's Infringing Goods.

63.     Upon information and belief, Hylete sold Infringing Goods bearing the Hylete Marks at the CrossFit games in 2012, which were held on July 11-15, 2012.

64.     Upon information and belief, Hylete had a booth at the 2012 CrossFit Games.

65.     Upon information and belief, Mr. Wilson only left the booth approximately twice per day and talked to every person he could to sell Hylete's Infringing Goods bearing the Hylete Marks.

66.     Upon information and belief, Mr. Wilson was the front person for Hylete at the 2012 CrossFit games.

67.     Upon information and belief, Mr. Wilson remains the front person for Hylete.

68.     Upon information and belief, Mr. Wilson oversees the whole Hylete company.

69.     Upon information and belief, Mr. Paulson is in charge of business development at Hylete.

70.     Upon information and belief, Mr. Wilson and Mr. Paulson own, operate, and exercise control over Hylete.

71.     Upon information and belief Mr. Wilson and Mr. Paulson own and operate Hylete, exercise control over Hylete, and are moving, conscious, dominant, and active forces behind Hylete's unlawful conduct complained of herein, which unlawful conduct Mr. Wilson and Mr. Paulson have engaged in for the benefit of Hylete and for their own individual gain and benefit.

72.     Upon information and belief, Mr. Wilson and Mr. Paulson direct, ratify, authorize, and approve Hylete's unlawful conduct complained of herein.

73.     Since the inception of Hylete, Mr. Wilson and Mr. Paulson have been the driving

force behind the trademark infringement activity of Hylete.

74.     Upon information and belief, Mr. Wilson and Mr. Paulson supervise all business aspects of Hylete concerning Hylete's advertising and use of Hylete's Marks.

75.     Upon information and belief, Mr. Wilson and Mr. Paulson intentionally direct Hylete employees to sell goods and services under the confusingly similar Hylete Marks despite knowing these goods and services infringe the Hybrid Marks.

76.     Despite knowing that Hybrid has trademark protection in the Hybrid Marks, Mr. Wilson and Mr. Paulson, on behalf of Hylete and also in an individual capacity, insist on continuing their infringing activities and directing, authorizing, and ratifying Hylete's infringing activities.

77.     Upon information and belief, Mr. Wilson and Mr. Paulson authorize and approve of Hylete's infringing acts.

78.     Upon information and belief, Mr. Wilson and Mr. Paulson are the principal architects of Hylete's infringement.

79.     Upon information and belief, Mr. Paulson made the first substantial monetary investment in Hylete of $50,000, which helped make possible Hylete's improper and unlawful acts described herein.

80.     Upon information and belief, Mr. Wilson and Mr. Paulson have ratified, consented to, and directed the infringing activities of Hylete and should, therefore, be held liable as owners, officers, and conscious driving forces of Hylete's infringing activities.

81.     In view of the above, Hybrid requests this Court find Mr. Wilson and Mr. Paulson personally liable for their activity being the driving force behind the trademark infringement being perpetrated by Hylete against Hybrid.

**C.**   **The Founders of Hylete Were Intimately Familiar with Hybrid and the Hybrid Marks Prior to Hylete's Formation**

82.   Upon information and belief, the current owners of Hylete have been well aware of Hybrid and the Hybrid Marks since at least 2010, which is well before Hylete's claim of first use of the Hylete Marks.

83.   Years prior to the formation of Hylete, Hybrid worked with a company called JACO, which produced shorts for Hybrid on which the Hybrid Marks were affixed.

84.   Upon information and belief, JACO kept the Hybrid Marks saved on its computer system.

85.   Upon information and belief, JACO saved the Hybrid Marks on its computer system in order to screen print them on the shorts that were purchased by and designated for Hybrid.

86.   Upon information and belief, the shorts designated for Hybrid were so popular, JACO could not produce them fast enough to keep Hybrid in stock.

87.   Upon information and belief, JACO, a small company of five to eight employees, was created and owned by the same person who created and now owns Hylete: Mr. Wilson.

88.   Upon information and belief, in designing a logo for JACO, Mr. Wilson utilized and modified an earlier-created logo.

89.   Upon information and belief, Mr. Paulson also worked at JACO prior to Hylete's formation.

90.   Upon information and belief, Mr. Paulson was a marketing manager for JACO.

91.   Upon information and belief, Mr. Paulson was also the director of sales at JACO.

92.   Upon information and belief, Mr. Paulson and another JACO employee, Jennifer

Null, were the two people at JACO tasked with managing Hybrid's account.

93.     Upon information and belief, while working with JACO, Mr. Paulson spoke to Mr. Wilson almost daily about the affairs of JACO.

94.     Upon information and belief, Mr. Wilson and Mr. Paulson knew of Mr. Orlando and Hybrid Athletics during their time at JACO.

95.     Upon information and belief, Mr. Wilson was personally shown a video of Mr. Orlando and Hybrid's ♛ logo via an email from Mr. Paulson dated January 5, 2012.  A true and correct copy of Mr. Paulson's email is attached hereto as **Exhibit E** and is incorporated herein by reference.

96.     Upon information and belief, in 2011 and 2012, Mr. Paulson was looking to sign Mr. Orlando as a strategic partner of JACO because of Mr. Orlando's fame and notoriety, and the success of Hybrid and the Hybrid Marks.

97.     Upon information and belief, Mr. Paulson met Mr. Orlando face-to-face for the first time on March 2, 2012 at the Arnold Classic.

98.     Upon information and belief, approximately two weeks after Mr. Paulson spoke with Mr. Orlando face-to-face for the first time, Mr. Paulson spoke to Mr. Wilson about starting a new company.

99.     Upon information and belief, Mr. Wilson was fired from JACO on March 16, 2012.

100.    Upon information and belief, a mere six days after Mr. Wilson was fired, Hylete filed a trademark application on "HYLETE."  This was a mere twenty days after Mr. Paulson met Mr. Orlando face-to-face.

101.    Upon information and belief, Mr. Wilson historically struggled to come up with

names for companies.

102.   Upon information and belief, despite historic difficulty in coming up with names for companies, Mr. Wilson allegedly created the Hylete brand 72 hours after being fired from JACO.

103.   Upon information and belief, when Mr. Wilson was fired from JACO, at least two JACO employees later left with him: Mr. Paulson and Ms. Null.

104.   Upon information and belief, when Mr. Wilson, Mr. Paulson, and Ms. Null left JACO to form Hylete, they requested that Mr. Orlando sign a co-branding deal due to his notoriety.

105.   In April 2012, mere weeks after Mr. Wilson was fired from JACO, Hybrid discovered Hylete's plans to promote, advertise, distribute, offer for sale, and sell clothing and apparel bearing marks substantially and confusingly similar to Hybrid's  and HYBRID ATHLETICS trademarks in connection with the Infringing Goods when Mr. Paulson sent Mr. Orlando a document showing Hylete's brand.

106.   Upon such discovery, Hybrid immediately contacted Hylete and objected to the use of the Hylete Marks as confusingly similar to the Hybrid Marks. A copy of the correspondence between Hybrid and Hylete regarding Hybrid's objections is attached hereto as **Exhibit D** and are incorporated herein by reference.

107.   After receiving Hybrid's objections, Defendants continued to use the Hylete Marks to start and build Defendants' company.

108.   Upon information and belief, Mr. Wilson also witnessed the success of Hybrid's brand as a result of his responsibilities managing JACO's social media accounts and viewing videos of Mr. Orlando.

109.    Upon information and belief, Mr. Wilson obtained substantial experience with websites and digital marketing throughout his career.

110.    Upon information and belief, before working with JACO, Mr. Wilson worked for at least three companies: 180s, H20, and Gathering Storm.

111.    Upon information and belief, Mr. Wilson gained substantial experience working with websites and digital marketing at 180s, H20, and Gathering Storm.

112.    Upon information and belief, Mr. Wilson's title at H20 was Director of Marketing, through which role he was heavily involved in websites.

113.    Upon information and belief, when Mr. Wilson worked at Gathering Storm he ran the day-to-day websites and a digital marketing and design team.

114.    Upon information and belief, Mr. Wilson gained significant social networking experience while at Gathering Storm.

115.    Upon information and belief, when Mr. Wilson began working for JACO he operated JACO's Facebook page and was the sole administrator for JACO's Facebook account.

116.    Upon information and belief, when Mr. Wilson was fired from JACO on March 16, 2012, JACO staff asked Mr. Wilson for JACO's Facebook administrator page, which Mr. Wilson withheld.

117.    Upon information and belief, while working for JACO, Mr. Wilson posted links to JACO's Facebook account related to Hybrid and Mr. Orlando on at least December 3, 2011, December 30, 2011, January 5, 2012, January 23, 2012, February 10, 2012, and March 5, 2012. Screenshots of the posts are attached hereto as **Exhibit F** and are incorporated herein by reference.

118.    The December 3, 2011 post links to a video located at

https://www.youtube.com/watch?v=UYISUs10LQI, which shows Hybrid's [logo] logo on the wall

behind Mr. Orlando and on a pair of shorts designed by Mr. Wilson.

119. The December 30, 2011 post references shorts with Mr. Orlando's "Hybrid

Athletics Logos."

120. Upon information and belief, the January 5, 2012 post links to the video that Mr.

Paulson sent to Mr. Wilson on January 5, 2012.

121. The January 23, 2012 post shows Hybrid's [logo] logo on a pair of shorts designed

by Mr. Wilson.

122. The February 10, 2012 post links to a video located at

https://www.youtube.com/watch?v=j75TgXNPnQE, which shows Hybrid's [logo] logo on a pair of

shorts designed by Mr. Wilson.

123. The March 5, 2012 post shows Hybrid's [logo] logo on a pair of shorts designed by

Mr. Wilson.

124. Upon information and belief, Mr. Wilson designed Hylete's confusingly similar

[logo] logo and name as a result of seeing Hybrid's [logo] logo and name at least in the months

leading up to Hylete's creation.

125. Upon information and belief, Mr. Wilson intentionally designed the confusingly

similar Hylete [logo] logo and name to trade off Hybrid's [logo] logo, name, business success,

reputation, and goodwill.

126. Upon information and belief, during his sworn testimonial deposition in a

Trademark Trial and Appeal Board trial (described below), Mr. Wilson attempted to conceal the

fact that he knew of Hybrid's [logo] logo before creating Hylete. A true and correct copy of

excerpts of Mr. Wilson's sworn testimony is attached hereto as **Exhibit G** and is incorporated herein by reference.

127.    Upon information and belief, during his sworn testimonial deposition in a Trademark Trial and Appeal Board trial, Mr. Paulson attempted to conceal the fact that Mr. Wilson knew of Hybrid's ⬡ logo before creating Hylete.  A true and correct copy of excerpts of Mr. Paulson's sworn testimony is attached hereto as **Exhibit H** and is incorporated herein by reference.

128.    Pursuant to the above, upon information and belief, the co-founders of Hylete and former JACO employees, namely Mr. Wilson and Mr. Paulson, were intimately familiar with the Hybrid Marks, both HYBRID ATHLETICS and the ⬡ trademarks, prior to creating Hylete.

129.    At least because of Mr. Wilson and Mr. Paulson's intimate familiarity with Hybrid and the Hybrid Marks prior to forming Hylete and their creating the confusingly similar Hylete Marks, Defendants' infringing activities complained of herein are willful.

**D.    The Trademark Trial and Appeal Board Trial**

130.    On October 16, 2013, Hybrid filed a Notice of Opposition with the Trademark Trial and Appeal Board (TTAB) against Hylete's ⬡ trademark application, Serial Number 85/837,045. (*See* Opposition No. 91213057.)

131.    The TTAB sustained Hybrid's Opposition by Order dated December 15, 2016.

132.    In the Order dated December 15, 2016, the TTAB concluded that Hybrid has priority over Hylete and that Hybrid demonstrated its first use of the Hybrid Marks in connection with fitness services and on clothing as early as 2008.

133.    In the Order dated December 15, 2016, the TTAB further concluded that Hylete's use of ⬡ is likely to cause confusion with Hybrid's ⬡ trademark.

134.   On January 17, 2017, Hylete requested reconsideration of the TTAB's Order dated December 15, 2016.

135.   By Order dated March 16, 2017, the TTAB denied Hylete's request.

136.   Upon information and belief, to date, Defendants continue to use, without authorization from Hybrid, the ⬥ mark which is substantially and confusingly similar to ⬥, in connection with the Infringing Goods.

137.   Hylete is not now, nor has it ever been associated, affiliated, or connected with or endorsed or sanctioned by Hybrid.

138.   Hybrid is not able to monitor, enforce, or maintain its quality control standards on the Infringing Goods that Hylete is marketing, promoting, offering for sale, and selling.

139.   In view of the similarities between the Hybrid Marks and the Hylete Marks, when used separately and in combination with each other, and the fact that Hylete's identified goods are identical or related to Hybrid's goods, there is a likelihood that Hylete's products are seen as being sponsored or affiliated with Hybrid as further demonstrated by the multiple instances of actual confusion since Hylete's formation in 2012.

140.   The Hylete Marks so resemble the Hybrid Marks as to be likely to cause confusion, or to cause mistake, or to deceive as to the source of the Infringing Goods within the meaning of Section 2(d) of the Lanham Act.

141.   Defendants' activities have harmed and continue to harm Hybrid and its intellectual property, which Hybrid has spent substantial time and investment to develop.

142.   Defendants' use of the Hylete Marks has damaged Hybrid in the selling of its goods and services by causing a likelihood of confusion.

143.   Defendants' use of the Hybrid Marks, or marks substantially similar thereto, in

the manner described herein creates the wrongful impression that Hylete's goods originate from Hybrid or that such goods are authorized, sponsored, or approved by Hybrid even though they are not.  This confusion causes irreparable harm to Hybrid and the Hybrid Marks.

144.    Defendants have been and/or will continue to be unjustly enriched by the illegal infringement and misappropriation of the Hybrid Marks, or marks substantially similar thereto, for Defendants' own financial gain. Additionally, Defendants have unfairly benefited and profited from Hybrid's outstanding reputation for high quality goods, as well as Hybrid's significant advertising and promotion of its goods and the goodwill that has developed in the Hybrid Marks for nearly a decade.

145.    Defendants' use of the Hylete Marks have caused irreparable harm to Hybrid.

146.    Defendants' acts are willful and deliberate and therefore this case constitutes an exceptional case under 15 U.S.C. § 1117(a).

147.    Defendants intentionally sought to trade off of Hybrid's Marks.

148.    Upon information and belief, Defendants' acts will continue unless enjoined by this Court.

149.    Hybrid has no adequate remedy at law.

**E.    Hylete's Financial Status**

150.    Upon information and belief, as of May 31, 2018, Hylete has raised $ 2,360,401 in Reg A+ equity and $8,655,848 in total equity crowdfunding.

151.    Upon information and belief, Hylete experienced net losses of $1,932,222, $2,093,801, and $3,232,973 in 2015, 2016, and 2017, respectively.

152.    Upon information and belief, Hylete's cash reserves have greatly decreased since 2016 ($1,175,019 in 2016 compared with $616,262 in 2017).

153.    Upon information and belief, Hylete's inventory has greatly increased since 2016 (approximately $1.5 million in 2016 compared with $2.2 million in 2017).

154.    Upon information and belief, Hylete's accounts payable have greatly increased since 2016 ($477,359 in 2016 compared with $915,733 in 2017).

155.    Upon information and belief, Hylete's accrued expenses have greatly increased since 2016 ($387,765 in 2016 compared with $810,934 in 2017).

156.    Despite the foregoing, on information and belief, Hylete paid annual salaries in excess of $550,000 in 2017 to three executives: Mr. Wilson ($216,426); Mr. Paulson ($136,729); and Garrett Potter ($211,716).

157.    Upon information and belief, Mr. Wilson and Mr. Paulson own a significant portion of the company.

158.    Thus, upon information and belief, Mr. Wilson and Mr. Paulson recoup significant salaries despite Hylete's worsening financial outlook.

## COUNT I
## Trademark Infringement Under 15 U.S.C. § 1114

159.    Hybrid repeats and re-alleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

160.    The Hybrid Marks and the goodwill of the business associated therewith in the United States are of great and significant value and are highly distinctive of Hybrid's goods and services.

161.    Defendants' actions described above have caused and are likely to cause confusion and mistake and to deceive potential customers and the general purchasing public as to the source, origin, or sponsorship of Hylete's goods, and are likely to deceive the public into believing that the goods offered and sold by Defendants originate from, are associated with, or

are otherwise authorized by Hybrid, all to the damage and detriment of Hybrid's reputation, goodwill, and sales.

162.    Defendants' actions constitute trademark infringement of Hybrid's federally-registered trademarks, the full extent of which is presently unknown but is substantial.  This has caused damage to Plaintiff and the substantial business and goodwill symbolized by Hybrid's Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

163.    Defendants' actions described above, including the unauthorized use of marks substantially similar to the Hybrid Marks in interstate commerce, have caused, and unless restrained will continue to cause, great and irreparable injury to Hybrid, to the Hybrid Marks, and to the business and goodwill represented thereby, leaving Hybrid with no adequate remedy at law.

## COUNT II
## False Designation of Origin and Unfair Competition Under 15 U.S.C. § 1125

164.    Hybrid repeats and re-alleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

165.    This claim is against Defendants for trademark infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

166.    Upon information and belief, Defendants have used, are using, and intend to continue using now and in the future in commerce the Hylete Marks for the offer and provision of goods and services in such a way that has and will continue to cause confusion, mistake, or deception as to an affiliation, connection, or association between Hylete and Hybrid.

167.    Upon information and belief, Defendants' use of the Hylete Marks for the offer and provision of goods and services has caused, is likely to cause, and will continue to cause confusion of the relevant public and trade.

168.    Hybrid has been and will continue to be damaged by the confusion, mistake, and deception caused by Defendants' use of the Hylete Marks.

169.    Any defect, objection to, or fault found with Hylete's goods and/or services sold or provided under the Hylete Marks would necessarily reflect on and seriously injure the reputation Hybrid has established for its marks and business.

170.    Hybrid does not and has never consented to or authorized Defendants' adoption or commercial use of the Hybrid Marks.  Defendants therefore have infringed and are infringing the Hybrid Marks in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

171.    Upon information and belief, at all times relevant to this action, including when Defendants first adopted the Hylete Marks and commenced commercial use of the Hylete Marks, Defendants knew of the prior adoption and widespread commercial use of the Hybrid Marks, and Defendants knew of the valuable goodwill and reputation acquired by Hybrid in connection with Hybrid's goods and services and the Hybrid Marks.  Defendants' infringement of the Hybrid Marks is therefore willful.

172.    Upon information and belief, Defendants, even after being place on notice of Hybrid's rights at least as early as April 2012, and after Hybrid filed an Opposition proceeding in 2013, continue to use the Hybrid Marks, or marks substantially similar thereto, in commerce. Defendants' infringement of the Hybrid Marks is therefore willful.

173.    Upon information and belief, Defendants' use of the Hylete Marks has caused confusion and mistake and the deception of purchasers as to the source of origin of Hylete's Infringing Goods.  Because of the confusion as to the source caused by Defendants' unauthorized use of the Hybrid Marks, or marks substantially similar thereto, Hybrid's valuable goodwill—developed at great expense and effort by Hybrid over the course of the last nine

years—is being irreparably harmed and is at risk of further damage.

174.    Defendants' infringement will continue unless enjoined by the Court.

175.    Hybrid has no adequate remedy at law.

**COUNT III**
**Unfair Competition Under Conn. Gen. Stat. § 42-110**

176.    Plaintiff repeats and re-alleges each and every allegation in the foregoing

paragraphs as if fully set forth herein.

177.    Defendants' acts as described above constitute unfair competition in violation of

Conn.Gen.Stat. § 42-110 (the Connecticut Unfair Trade Practices Act).

178.    Defendants' use of the Hybrid Marks, or marks substantially similar thereto, is

likely to and does permit Defendants to palm off Hylete's goods as those of Hybrid, all to the

detriment of Hybrid and the unjust enrichment of Defendants.  Defendants have further palmed

off Hylete's goods as Hybrid's by their misrepresentations to the consuming public, members of

whom are likely to and do believe Hylete's goods emanate from or are associated with Hybrid.

179.    Defendants' acts permit and accomplish confusion, mislead and deceive the

public as to the source of Hylete's goods, permit and accomplish palming off of Hylete's goods

as Hybrid's, and falsely suggest a connection between Hylete and Hybrid, thus constituting

unfair competition with Hybrid in violation of Connecticut law.

180.    Defendants acts have caused and will continued to cause Hybrid irreparable harm

unless enjoined by this Court.

181.    Hybrid has no adequate remedy at law.

**COUNT IV**
**Common Law Trademark Infringement**

182.    Hybrid repeats and re-alleges each and every allegation in the foregoing

paragraphs as if fully set forth herein.

183.    This claim is against Defendants for common law trademark infringement.

184.    In addition to the federal registrations owned by Hybrid, as set forth above, the Hybrid Marks enjoys common law rights in Connecticut and throughout the United States. These rights are senior and superior to any rights that Hylete may claim.

185.    Defendants' use of the Hylete Marks is unauthorized and intentionally designed to mimic the Hybrid Marks so as to cause confusion regarding the source of Hylete's goods in that purchasers thereof will be likely to associate or have associated such products with Hybrid or as originating from or approved by Hybrid, all to the detriment of Hybrid.

186.    Defendants' infringement will continue unless enjoined by the Court.

187.    Hybrid has no adequate remedy at law.

**COUNT V**
**Unjust Enrichment**

188.    Hybrid repeats and re-alleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

189.    Defendant has usurped for itself revenue and property rights belonging to Hybrid for the purpose of enhancing the commercial value of Defendants' own business.

190.    Through Defendants' extensive use of Hylete's "H" mark, , confusingly similar to Hybrid's , as well as Defendants combining the mark with a term that is an abbreviation of "Hybrid Athletics," i.e. "Hylete," Defendants have been unjustly enriched by using the reputation of Hybrid to grow Hylete's business, creating the confusing and mistaken belief that Hylete was and is an update or extension to and therefore affiliated with Hybrid's brand.

191.    As a direct and proximate result of Defendants' actions, Hybrid has suffered, and will continue to suffer, loss of profits by virtue of Defendants' conduct.

### PRAYERS FOR RELIEF

WHEREFORE, Hybrid prays for judgment as follows:

A.      That judgment be entered in favor of Hybrid and against Defendants on each and every Count in this Complaint;

B.      For entry of an order and judgment enjoining Defendants, their officers, members, agents, servants, employees, attorneys, and all persons in active concert or participating with any of them, during the pendency of this action and permanently thereafter from:

i.      advertising, marketing, promoting, selling or otherwise offering for sale any goods or services that are confusingly similar to Hybrid's, bearing the Hybrid Marks or any derivation or colorable imitation thereof, or any mark confusingly similar thereto;

ii.     making or employing any commercial use of the Hylete Marks, any derivation or colorable imitation thereof, or any mark confusingly similar to the Hybrid Marks;

iii.    using any other false designation of origin or false description or representation or any other thing calculated or likely to cause confusion or mistake in the mind of the trade or public or to deceive the trade or public into believing that Hylete's goods or activities are in any way sponsored, licensed, or authorized by or affiliated or connected with Hybrid;

iv.     doing any other acts or things calculated to confuse or likely to cause confusion or mistake in the mind of the public or to lead purchasers or consumers or investors into the belief that the products or services promoted, offered, or sponsored by

29

Hylete come from Hybrid, or are somehow licensed, sponsored, endorsed, or authorized by, or otherwise affiliated or connected with Hybrid;

      v.      otherwise competing unfairly with Hybrid in any manner; and

      vi.      assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (i) through (v), or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i) through (v);

C.      Direct Hylete to file with the Court and serve on counsel for Hybrid within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement pursuant to 15 U.S.C. § 1116(a) setting forth in detail the manner and form in which Defendants have complied with any injunction which the Court may enter in this action.

D.      Direct Defendants to account to Hybrid for Hylete's profits and order that Hybrid recover its damages arising out of the acts of deception and infringement described above, and a sum equal to three times such profits or damages (whichever is greater), pursuant to 15 U.S.C. § 1117(a) and (b) and other applicable law;

E.      That each such award of damages be enhanced to the maximum available for each infringement in view of each of Defendants' willful infringements of Hybrid's rights;

F.      Award Hybrid punitive damages on account of Defendants' gross, wanton, willful, and malicious conduct;

G.      Award Hybrid pre-judgment and post-judgment interest;

H.      Direct Defendants to deliver up for destruction any and all guarantees, circulars, price lists, labels, brochures, business cards, signs, prints, packages, wrappers, pouches,

advertising matter, promotional, and other materials in the possession or control of Defendants bearing the Hylete Marks, any derivation or colorable imitation thereof, or any mark confusingly similar thereto or likely to dilute or detract from the Hybrid Marks, in accordance with 15 U.S.C. § 1118;

  I.  Award Hybrid its reasonable attorneys' fees along with the costs and disbursements incurred herein as a result of Defendants' intentional and willful infringement, pursuant to 15 U.S.C. § 1117, the CUTPA and other applicable law, and restitution and/or disgorgement of all revenue, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of their unlawful and/or fraudulent actions and practices;

  J.  Award Hybrid such other and further relief as the Court deems just and proper.

<strong>JURY DEMAND</strong>

Hybrid demands a trial by jury on all claims and issues so triable.

      Respectfully Submitted,

Date: September 12, 2018    */s/ Michael J. Kosma*
            Michael J. Kosma, ct27906
            Benjamin N. Luehrs, phv08980
            Whitmyer IP Group LLC
            600 Summer Street
            Stamford, CT 06901
            Tel:  203-703-0800
            Fax:  203-703-0801
            Email: litigation@whipgroup.com
               mkosma@whipgroup.com
               bluehrs@whipgroup.com

            ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 12th day of September, 2018, a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


<u>September 12, 2018</u>                    <u>      */s/ Joan M. Burnett*      </u>
Date                                           Joan M. Burnett